UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SCOTT SEDORE #210661,

        Plaintiff,                                Hon. Robert J. Jonker

v.                                         Case No. 1:19-cv-61

NOAH NAGY, et al.,

        Defendants.

_____/

## REPORT AND RECOMMENDATION

This matter is before the Court on Defendant's Motion for Summary Judgment (ECF No. 27) and Defendants' Motion for Summary Judgment (ECF No. 32). Pursuant to 28 U.S.C. § 636(b)(1)(B), the undersigned recommends that Defendant's Motion for Summary Judgment (ECF No. 27) be granted in part and denied in part, Defendants' Motion for Summary Judgment (ECF No. 32) be granted, and this matter terminated.

## BACKGROUND

Plaintiff is presently incarcerated with the Michigan Department of Corrections (MDOC) at the G. Robert Cotton Correctional Facility. The events giving rise to this action, however, occurred at the Lakeland Correctional Facility (LCF). Plaintiff initiated this action against Corizon Health, Inc., the MDOC, the unknown members of the MDOC Pain Committee (Unknown Parties #1), the MDOC Chief Medical Officer (Unknown Party #1), and the MDOC Assistant Chief Medical Officer (Unknown Party

#2).    Plaintiff also sued the following LCF officials: Warden Noah Nagy; Deputy Warden Bryan Morrison; Nurse and Health Unit Manager (HUM) Christine Pigg; Nurse Practitioner Tammy Kelley; and Dr. Oliver Johnston.    In its March 26, 2019 screening opinion, (ECF No. 5), the Court described Plaintiff's allegations as follows.

On October 9, 2009, before he was incarcerated with the MDOC, Plaintiff was involved in a high-speed, head-on motor vehicle accident while he was intoxicated.    As a result of the accident, one person died, another was seriously injured, as was Plaintiff. In the accident, Plaintiff sustained serious head injuries, traumatic stress disorder, cardiac contusion, pulmonary contusion, broken teeth, bilateral broken ribs, broken sternum, bilateral hip fractures, bilateral broken femurs, broken right arm, fractured left foot, left torn meniscus, and an open injury to his left fibula/tibia.

In his sixty-page, repetitive complaint, Plaintiff sweepingly alleges that all Defendants violated his rights under the Eighth Amendment by denying him necessary medical care for his many serious medical needs, which he repeatedly lists as follows: (1) the collection of a comprehensive set of pre-incarceration medical records; (2) surgery on his right hip; (3) spinal fusion surgery; (4) cardiologist referral; (5) urologist referral; (6) pulmonary/respiratory referral; (7) adequate pain management; (8) referral for MRIs on both knees; (9) arthroscopic evaluation of his right knee; (10) surgery to remove the rod from his left femur; (11) referral to a surgeon to address the loose screw in the hardware in his left foot; (12) referral to a neurologist to treat poly-neuropathy; (13) referral for treatment of post-traumatic stress disorder; (14) referral for treatment

-2-

of traumatic brain injuries; (15) special accommodations for a raised toilet seat, an extra air mattress, and a sock donner; (16) referral for hearing testing; (17) referral to Duane Waters Hospital for orthotic shoes; and (18) referral to address Plaintiff's inability to use a CPAP machine.   Plaintiff also makes numerous complaints about the adequacy of grievance handling and grievance responses, as well as his placement on modified grievance access.[1]

After 33 pages of general complaints, Plaintiff finally articulates the specific incidents about which he complains in the second half of the complaint.   Those complaints involve only a small set of dates on which he sought treatment or was treated.

First, Plaintiff alleges that Defendant Pigg was deliberately indifferent to his medical needs when, on May 31, 2018, she took no action on a kite, in which Plaintiff advised her that he needed new orthotic shoes, which have a 1-inch lift in the left shoe.

Second, Plaintiff complains that, when Defendant Dr. Johnston saw him on June 27, 2018, about his serious and chronic pain issues, Johnston refused to provide anything stronger than Naproxen, despite knowing that Plaintiff would not obtain relief

---

[1] Under the then-applicable version of Michigan Department of Corrections policy, a prisoner is placed on modified access for filing "an excessive number of grievances which are frivolous, vague, duplicative, non-meritorious, raise non-grievable issues, or contain prohibited language. . .or [are] unfounded . . . ."   Mich. Dep't of Corr., Policy Directive 03.02.130, ¶ HH.  (eff. July 9, 2007).   The modified access period is ninety days and may be extended an additional thirty days for each time the prisoner continues to file a prohibited type of grievance.   *Id.*   While on modified access, the prisoner only can obtain grievance forms through the Step-I coordinator, who determines whether the issue is grievable and otherwise meets the criteria under the grievance policy.   *Id.*, ¶ KK.

from the drug.   Plaintiff recites separate paragraphs for each of the other seventeen serious issues, which Plaintiff alleges Defendant Johnston refused or neglected to address.   Plaintiff alleges that, on October 26, 2017, Dr. Epko, an orthopedic surgeon, recommended that Plaintiff have surgery on his right hip before proceeding to recommended spinal fusion surgery.   Dr. Epko also recommended that a neurologist assess and treat Plaintiff's poly-neuropathy.   Corizon, however, refused the hip surgery, and the other treatments were not pursued.

Third, Plaintiff complains that, on July 23, 2018, he wrote a kite to Defendant Pigg about his chronic weight loss (forty pounds over a two-month period), complaining that the frequency of his weight checks was being cut back.   Defendant Pigg did not respond to the kite.

Fourth, Plaintiff had an appointment with Defendant Nurse Practitioner Kelley on July 10, 2018, to address his chronic pain issues.   Plaintiff complains that Defendant Kelley offered him no assistance with his pain, other than an injection of an anti-inflammatory.

Fifth, on July 12, 2018, Plaintiff attended an appointment with a nurse to address his kites about his chronic pain.   The nurse went to speak with Defendant Kelley, who again offered an injection of an anti-inflammatory, which Plaintiff complains was useless and ineffective.   Defendant Kelley, however, did not schedule an appointment to see her. The nurse also spoke with Defendant Dr. Johnston about Plaintiff's claims that he was

receiving inadequate pain medications.   Defendant Johnston did not see Plaintiff at that time and did not offer additional medications.

Sixth, on July 25, 2018, Plaintiff had an appointment with Defendant Kelley for an unspecified reason.   Plaintiff recites in successive paragraphs Defendant Kelley's failure or refusal to discuss each of the eighteen previously listed health issues about which Plaintiff complains.   Defendant Kelley advised Plaintiff that he should try to remain in one prison for a sufficient length of time to ensure continuity of care.   She also told Plaintiff that he should try to work with his medical providers rather than arguing with them constantly.   Finally, Defendant Kelley refused to refer Plaintiff to Duane Waters Hospital for new orthotic shoes, stating, "I'm not going to refer you to get a new pair of shoes.   You don't walk so you don't need shoes."   (Compl., ECF No. 1-1, PageID.40.)   Plaintiff complains that his shoes are two-and-one-half years old and the Velcro straps are worn out.

Seventh, Plaintiff alleges that he wrote a kite to Defendant Pigg on July 29, 2018, complaining about his forty-pound weight loss over two months.   Defendant Pigg did not reply.   In addition, on July 31, 2018, Plaintiff wrote multiple-page kites to Defendant Warden Nagy, Defendant Deputy Warden Morrison, and Defendant Nurse Pigg, complaining about inhumane medical care delivered by Defendants Kelley and Johnston.   None of the officials responded to his kites.   Plaintiff wrote 19 Step-I grievances on August 3, 2018.

Eighth, Plaintiff complains that he had an appointment with Defendant Kelley on August 2, 2018.   Plaintiff advised Kelley that, following a consultation with Dr. James Richardson at the University of Michigan on June 5, 2018, he was referred to another specialist, Dr. Hassen Berri, to perform an ultrasound-guided evaluation of Plaintiff's right hip and groin and to perform an ultrasound-guided injection to his PSOAS tendon. When Plaintiff inquired about the referral, Kelley responded, "Why would we send you to see a specialist to do this injection?[]   I could send you to one of our (Corizon/M.D.O.C.) Doctor[]s at Duane Waters Health Center."   (*Id.*, PageID.42.) When Plaintiff objected that Kelly was not a specialist, she informed him that it was his only option.   Dr. Henderson (not a Defendant) ultimately provided an injection, but Henderson only took x-rays (which do not show tendons or other soft tissue) and the injection was not ultrasound-guided.   The injection provided no relief for Plaintiff's pain and hip issues.   On September 17, 2018, Plaintiff received a letter from Dr. Hassen Berri's office, inquiring why Plaintiff had missed his appointment.   Plaintiff next lists a series a paragraphs addressed to Defendant Kelley's failure or refusal to discuss any of Plaintiff's other seventeen health problems at the August 2, 2018, appointment.

Ninth, Plaintiff alleges that he had an appointment with Defendant Kelley on August 7, 2018, at which she advised him that she had submitted a referral to the MDOC pain-management committee.   Thereafter, Plaintiff alleges in separate paragraphs Defendant Kelley's failure to address each of Plaintiff's seventeen additional health issues.

-6-

Tenth, on August 31, 2018, Plaintiff had an appointment with Defendant Kelley to discuss the recommendations of the MDOC pain-management committee. The committee recommended that Plaintiff's pain be treated with 400 mg of Neurontin twice each day, Tylenol, and naproxen. Plaintiff complains that he had tried the recommended medications, but they did not adequately control his pain. Plaintiff contends that Defendant Kelley, the pain committee, and the chief medical officer were all deliberately indifferent to his serious pain. Plaintiff next alleges, in separate paragraphs for each, that Defendant Kelley did not treat any of his other seventeen medical needs at the appointment.

Eleventh, Plaintiff alleges that, on October 11, 2018, he wrote kites to Defendant Warden Nagy, Deputy Warden Morrison, and Health Unit Manager Pigg, complaining about the deliberate indifference of Defendants Kelley, Johnston, and Corizon to Plaintiff's serious medical needs. Plaintiff also contends that, on that same day, he wrote a kite to the grievance coordinator, seeking nineteen grievance forms, but his requests were denied, as he was on modified grievance access.

Plaintiff alleges that, as the result of his untreated medical needs, he suffers chronic, agonizing pain. He also suffers major restrictions in his ability to dress himself, put on shoes, get in and out of bed, use the toilet, and clean himself. Plaintiff uses a wheelchair for almost all movement, and he cannot clean his cell or move his foot lockers.

-7-

On screening, the Court dismissed Plaintiff's claims against the following Defendants: (1) MDOC, (2) Nagy, (3) Morrison, and (4) Unknown Parties #1 and #2.   The Court permitted Plaintiff's complaint to be served on Defendants Pigg, Kelley, Johnston, and Corizon.   These Defendants now move for summary judgment on the ground that Plaintiff has failed to properly exhaust his administrative remedies.   Plaintiff has responded to Defendants' motions.

## SUMMARY JUDGMENT STANDARD

Summary judgment "shall" be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   Fed. R. Civ. P. 56(a).   A party moving for summary judgment can satisfy its burden by demonstrating "that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case."   *Minadeo v. ICI Paints*, 398 F.3d 751, 761 (6th Cir. 2005).   Once the moving party demonstrates that "there is an absence of evidence to support the nonmoving party's case," the non-moving party "must identify specific facts that can be established by admissible evidence, which demonstrate a genuine issue for trial."   *Amini v. Oberlin College*, 440 F.3d 350, 357 (6th Cir. 2006).

While the Court must view the evidence in the light most favorable to the non-moving party, the party opposing the summary judgment motion "must do more than simply show that there is some metaphysical doubt as to the material facts."   *Amini*, 440 F.3d at 357.   The existence of a mere "scintilla of evidence" in support of the non-

-8-

moving party's position is insufficient.  *Daniels v. Woodside*, 396 F.3d 730, 734-35 (6th Cir. 2005).  The non-moving party "may not rest upon [his] mere allegations," but must instead present "significant probative evidence" establishing that "there is a genuine issue for trial."  *Pack v. Damon Corp.*, 434 F.3d 810, 813-14 (6th Cir. 2006).

Moreover, the non-moving party cannot defeat a properly supported motion for summary judgment by "simply arguing that it relies solely or in part upon credibility determinations."  *Fogerty v. MGM Group Holdings Corp., Inc.*, 379 F.3d 348, 353 (6th Cir. 2004).  Rather, the non-moving party "must be able to point to some facts which may or will entitle him to judgment, or refute the proof of the moving party in some material portion, and. . .may not merely recite the incantation, 'Credibility,' and have a trial on the hope that a jury may disbelieve factually uncontested proof."  *Id.* at 353-54. In sum, summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Daniels*, 396 F.3d at 735.

While a moving party without the burden of proof need only show that the opponent cannot sustain his burden at trial, a moving party with the burden of proof faces a "substantially higher hurdle."  *Arnett v. Myers*, 281 F.3d 552, 561 (6th Cir. 2002). Where the moving party has the burden, "his showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986).  The Sixth Circuit has emphasized that the party with the burden of proof "must show the record contains

evidence satisfying the burden of persuasion and that the evidence is so powerful that no reasonable jury would be free to disbelieve it."   *Arnett*, 281 F.3d at 561.   Accordingly, summary judgment in favor of the party with the burden of persuasion "is inappropriate when the evidence is susceptible of different interpretations or inferences by the trier of fact."   *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999).

## ANALYSIS

### I.   Exhaustion

Pursuant to 42 U.S.C. § 1997e(a), a prisoner asserting an action with respect to prison conditions under 42 U.S.C. § 1983 must first exhaust all available administrative remedies.   *See Porter v. Nussle*, 534 U.S. 516, 524 (2002).   Prisoners are no longer required to demonstrate exhaustion in their complaints.   *See Jones v. Bock*, 549 U.S. 199, 216 (2007).   Instead, failure to exhaust administrative remedies is "an affirmative defense under the PLRA" which the defendant bears the burden of establishing.   *Id*. With respect to what constitutes proper exhaustion, the Supreme Court has stated that "the PLRA exhaustion requirement requires proper exhaustion" defined as "compliance with an agency's deadlines and other critical procedural rules."   *Woodford v. Ngo*, 548 U.S. 81, 90-93 (2006).   In *Bock*, the Court reiterated that

> Compliance with prison grievance procedures, therefore, is all that is required by the PLRA to 'properly exhaust.'   The level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion.

549 U.S. at 218.

MDOC Policy Directive 03.02.130 articulates the applicable grievance procedures for prisoners in MDOC custody. Prior to submitting a grievance, a prisoner is required to "attempt to resolve the issue with the staff member involved within two business days after becoming aware of a grievable issue, unless prevented by circumstances beyond his/her control or if the issue falls within the jurisdiction of the Internal Affairs Division in Operations Support Administration." Mich. Dep't of Corr. Policy Directive 03.02.130 ¶ P (July 9, 2007).[2] If this attempt is unsuccessful (or such is inapplicable), the prisoner may submit a Step I grievance. *Ibid.* The Step I grievance must be submitted within five business days after attempting to resolve the matter with staff. *Id.* at ¶ V. The issues asserted in a grievance "should be stated briefly but concisely" and the "[d]ates, times, places, and names of all those involved in the issue being grieved are to be included." *Id.* at ¶ R.

If the prisoner is dissatisfied with the Step I response, or does not receive a timely response, he may appeal to Step II within ten business days of the response, or if no response was received, within ten business days after the response was due. *Id.* at ¶ BB. If the prisoner is dissatisfied with the Step II response, or does not receive a timely Step II response, he may appeal the matter to Step III. *Id.* at ¶ FF. The

---

[2] On March 18, 2019, this version of the policy was superseded by the now current version. A copy of the version relevant to this matter has been submitted as an attachment to the current motions. (ECF No. 28 at PageID.497-503; ECF No. 32 at PageID.980-86).

Step III grievance must be submitted within ten business days after receiving the Step II response, or if no Step II response was received, within ten business days after the date the Step II response was due.   *Ibid.*

In support of their motions, Defendants have provided evidence regarding numerous grievances Plaintiff pursued.   This evidence reveals the following.

A.     Rejected Grievances – Vague and Extraneous Information

The MDOC has long articulated a detailed policy designed, at least in part, to instruct prisoners how to properly invoke the prison grievance process.   One aspect of the MDOC's grievance policy concerns the proper scope of a prisoner grievance and the detail to be included therein.   On this topic, the policy in effect during the dates in question admonished prisoners to state their issues "concisely" and limit the information provided to "the facts involving the issue being grieved (i.e., who, what, when, where, why, how)."   *Id.* at ¶ R.

This policy further instructed prisoners that a grievance "may be rejected" for several reasons, including: (1) the grievance is vague, illegible, contains multiple unrelated issues, or raises issues that are duplicative of those raised in another grievance filed by the grievant; (2) the grievance did not attempt to resolve the issue with the staff member involved prior to filing the grievance; or (3) the grievance is not timely filed.   *Id.* at ¶ G.

As noted above, the PLRA requires prisoners to properly exhaust their claims defined as "compliance with an agency's deadlines and other critical procedural rules."

Accordingly, if the MDOC rejects a grievance for a reason "explicitly set forth in the applicable grievance procedure," such grievance cannot serve to exhaust a subsequent claim based on the allegations therein.   *Johnson v. Wilkinson*, 2019 WL 3162375 at *3 (W.D. Mich., July 16, 2019).

Plaintiff submitted 22 grievances that were rejected at all three steps of the grievance process on one or more of the following grounds: (1) the grievance contained "unnecessary information," which "adds confusion" to Plaintiff's allegations; (2) the grievance was vague and lacked specific details; (3) the grievance asserted multiple issues; (4) Plaintiff failed to attempt to resolve the matter with the appropriate staff member before filing a grievance; and (5) Plaintiff's grievance was not timely filed. (ECF No. 28 at PageID.579-708).[3]   A review of these grievances reveals that the decision to reject each was appropriate.   Accordingly, none of these grievances serves to exhaust any of Plaintiff's remaining claims.

B.      Grievance LCF-18-08-0749-11g

Plaintiff filed this grievance to complain that certain grievances he filed were not being processed quickly enough.   (ECF No. 28 at PageID.576).   Plaintiff pursued this

---

[3] The grievances in question are identified as follows: (1) LCF-18-09-0871-28b; (2) LCF-18-09-0872-28i; (3) LCF-18-09-0870-28b; (4) LCF-18-08-0789-28b; (5) LCF-18-08-0767-28e; (6) LCF-18-08-0779-28b; (7) LCF-18-08-0781-28b; (8) LCF-18-08-0782-28b; (9) LCF-18-08-0783-28b; (10) LCF-18-08-0784-28b; (11) LCF-18-08-0785-28b; (12) LCF-18-08-0786-28b; (13) LCF-18-08-0794-28b; (14) LCF-18-08-0788-28b; (15) LCF-18-08-0761-28b; (16) LCF-18-08-0790-28b; (17) LCF-18-08-0791-28b; (18) LCF-18-08-0792-28b; (19) LCF-18-08-0793-28b; (20) LCF-18-080796-28b; (21) LCF-18-08-0795-28b; (22) LCF-18-08-0787-28b.

grievance through all three steps.   (*Id.* at 574-78).   Plaintiff has not advanced any claim in his complaint, however, regarding the speed at which his numerous grievances were processed.   Accordingly, this grievance does not serve to exhaust any of Plaintiff's remaining claims.

C.   Grievance LCF-18-08-0741-01g

Plaintiff filed this grievance on August 7, 2018, alleging that he had improperly been charged a $5.00 co-pay for a medical examination.   (ECF No. 28 at PageID.569).   Plaintiff pursued the matter through all three steps of the grievance process and was refunded the $5.00 in question.   (*Id.* at PageID.566-73).   Plaintiff has not advanced any claim in his complaint, however, regarding this matter.   Accordingly, this grievance does not serve to exhaust any of Plaintiff's remaining claims.

D.   Grievance LCF-18-07-0710-12e3

Plaintiff filed this grievance alleging that on July 19, 2018, he was removed from a daily weight monitoring program.   (ECF No. 28 at PageID.712).   Plaintiff pursued the matter through all three steps of the grievance process.   (*Id.* at PageID.709-14).   Plaintiff has not advanced any claim in his complaint, however, regarding this matter.   Accordingly, this grievance does not serve to exhaust any of Plaintiff's remaining claims.

E.   Plaintiff's Response

In response to Defendants' motions, Plaintiff has not identified any other grievances which allegedly exhaust the claims in question.   Instead, Plaintiff primarily argues the substantive merit of his various Eighth Amendment claims, which is not

presently relevant.   To the extent Plaintiff addresses the merits of Defendants' exhaustion arguments, Plaintiff asserts two arguments, one of which is without merit and another which is persuasive as to one of his remaining claims.

First, Plaintiff argues that the grievances referenced in Section A above were improperly rejected because MDOC policy required that he be permitted an opportunity to correct the deficiencies in his grievances before being rejected.   (ECF No. 30 at PageID.718).   The shortcoming with this argument, however, is that in support thereof Plaintiff cites to a version of the MDOC grievance policy which was no longer in effect when the events giving rise to this action occurred.   Specifically, Plaintiff relies on a policy which was enacted in 2003 and which was superseded no later than 2007.   (ECF No. 30 at PageID.737-42; ECF No. 32 at PageID.980-86).   The grievance policy in effect during the time period relevant in this matter contained no such requirement.   (ECF No. 32 at PageID.980-86).   Accordingly, this argument is rejected.

Plaintiff next argues that Defendants' motion should be denied because he exhausted all his *available* administrative remedies.   Plaintiff was placed on modified grievance access between September 5, 2018, and December 4, 2018.   (ECF No. 30 at PageID.752).   As noted above, when a prisoner is on modified access he cannot file a grievance unless it is pre-approved and the grievance coordinator provides the prisoner with a grievance form.   If a prisoner on modified access requests a grievance form, in a manner consistent with MDOC policy, denial of such a request constitutes exhaustion of available administrative remedies as to the claims or issues described in the grievance

-15-

form request.   *See, e.g., Brown v. Michigan Department of Corrections*, 2016 WL 5921911 at *3 (W.D. Mich., Sept. 15, 2016).

As discussed above, one of Plaintiff's claims is that, on October 11, 2018, he submitted a kite to Defendant Pigg in which he complained about the failure by others to provide him with proper medical care.   Plaintiff alleges that Defendant Pigg failed to respond to this kite thereby violating his Eighth Amendment rights.   This event occurred during the time Plaintiff was on modified grievance access.   Plaintiff has submitted an affidavit in which he asserts that he requested a grievance form regarding this matter and that his request was denied.   (ECF No. 30 at PageID.746-48).   This is sufficient to establish that Plaintiff exhausted his available administrative remedies with respect to this claim.   Plaintiff's placement on modified grievance access status is irrelevant to Plaintiff's other remaining claims, however, because all occurred well before Plaintiff was placed on modified access status.

In conclusion, the Court finds that Plaintiff has failed to properly exhaust his remaining claims, save Plaintiff's claim that Defendant Pigg failed to respond to his October 11, 2018 kite.   Accordingly, the undersigned recommends that the motion for summary judgment by Defendants Kelley, Johnston, and Corizon be granted, and Plaintiff's claims against these Defendants be dismissed without prejudice for failure to exhaust administrative remedies.   The undersigned further recommends that the motion for summary judgment filed by Defendant Pigg be granted in part and denied in part, and that Plaintiff's claims against Pigg be dismissed without prejudice for failure

to exhaust administrative remedies, save the claim that Defendant Pigg failed to respond to Plaintiff's October 11, 2018 kite.

## II.    Failure to State a Claim

Plaintiff has been permitted to proceed as a pauper in this matter.   Pursuant to federal law, "[n]otwithstanding any filing fee, or portion thereof, that may have been paid" by a litigant pauper, "the court *shall* dismiss the case *at any time* if the court determines that. . .the action. . .fails to state a claim on which relief may be granted." 28 U.S.C. § 1915(e)(2)(B)(ii) (emphasis added).   A claim must be dismissed for failure to state a claim on which relief may be granted unless the "[f]actual allegations [are] enough to raise a right for relief above the speculative level on the assumption that all of the complaint's allegations are true."   *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 545 (2007); *see also*, *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009) (to avoid dismissal, a complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face'").

As discussed above, the only remaining claim that Plaintiff has properly exhausted is his claim that Defendant Pigg failed to respond to his October 11, 2018 kite. It is important to note, however, that Plaintiff did not submit this kite requesting that Pigg provide him with medical care.   Instead, Plaintiff submitted this kite to Pigg complaining about the alleged failure by others to provide him with proper medical care. Properly understood, Plaintiff's kite was no different from a grievance in that Plaintiff was complaining about the conduct of others and seeking action from an individual not

personally involved in the challenged conduct.   As is well understood, however, the failure by a prison official to respond to an administrative request for relief such as a grievance or kite fails to state a claim.   *See, e.g., Skinner v. Govorchin*, 463 F.3d 518, 525-26 (6th Cir. 2006); *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999); *Lee v. Michigan Parole Board*, 2004 WL 1532563 at *2 (6th Cir., June 23, 2004); *Alder v. Correctional Medical Services*, 2003 WL 22025373 at *2 (6th Cir., Aug. 27, 2003). Accordingly, the undersigned recommends that Plaintiff's claim that Defendant Pigg failed to respond to his October 11, 2018 kite be dismissed for failure to state a claim.

## **CONCLUSION**

For the reasons articulated herein, the undersigned recommends that Defendant's Motion for Summary Judgment (ECF No. 27) be **GRANTED in part and DENIED in part**, and Defendants' Motion for Summary Judgment (ECF No. 32) be **GRANTED**. Specifically, the undersigned recommends the following: (1) Plaintiff's claims against Defendants Kelley, Johnston, and Corizon be dismissed without prejudice for failure to exhaust administrative remedies; (2) Plaintiff's claims against Pigg be dismissed without prejudice for failure to exhaust administrative remedies, save the claim that Pigg failed to respond to Plaintiff's October 11, 2018, kite; (3) Plaintiff's claim that Defendant Pigg failed to respond to his October 11, 2018, kite be dismissed for failure to state a claim; and (4) this matter be terminated.

Date: November 26, 2019       /s/ Phillip J. Green
                                       PHILLIP J. GREEN
                                      United States Magistrate Judge

## **NOTICE TO PARTIES**

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of the date of service of this notice.  28 U.S.C. § 636(b)(1)(C). Failure to file objections within the specified time waives the right to appeal the District Court's order.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir.1981).

-19-